## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMANDA M. WATUNYA, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : C.A. No. 10-613-LPS |
| | : |
| MICHAEL J. ASTRUE, | : |
| Commissioner of Social Security, | : |
| | : |
| Defendant. | : |
| | : |

Angela Pinto Ross, Esquire, of DOROSHOW, PASQUALE, KRAWITZ, SIEGEL & BHAYA, Wilmington, DE.

    Attorney for Plaintiff.

Charles M. Oberly, III, Esquire, United States Attorney and Dina White Griffin, Esquire OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, DE.

Eric P. Kressman, Esquire, SOCIAL SECURITY ADMINISTRATION - REGION III OFFICE OF GENERAL COUNSEL, Philadelphia, PA.

    Attorneys for Defendant.

## **MEMORANDUM OPINION**

August 24, 2012
Wilmington, Delaware

STARK, U.S. District Judge:

## I.  INTRODUCTION

Plaintiff, Amanda M. Watunya ("Watunya" or "Plaintiff"), appeals from a decision of defendant, Michael J. Astrue, the Commissioner of Social Security ("Commissioner" or "Defendant"), denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Plaintiff and the Commissioner. (D.I. 20, 25) Plaintiff seeks reversal of Defendant's decision and an award of DIB or, in the alternative, remand for further analysis. (D.I. 21 at 23) Defendant requests the Court affirm his decision. (D.I. 27 at 23) For the reasons set forth below, the Court will deny Plaintiff's motion for summary judgment and grant Defendant's motion for summary judgment.

## II.  BACKGROUND

### A.  Procedural History

Plaintiff filed her claim for DIB on October 6, 2005, alleging disability since December 31, 2003, due to neck, elbow, hand, and back injuries, depression, and mood and behavior impairments. (*See* D.I. 12 (hereinafter "Tr.") at 22, 71, 87-88) Plaintiff's claim for DIB was denied initially and upon reconsideration. (*Id.* at 22) Thereafter, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 54) A hearing was held on May 6, 2008 before ALJ Melvin D. Benitz, at which Plaintiff was represented by counsel. (*Id.* at 690) Plaintiff and a vocational expert testified at the hearing. (*See id.* at 692-726) On July 7, 2008,

1

the ALJ issued a written decision, in which he found that Plaintiff was not disabled as defined in the Social Security Act. (*Id.* at 38) Plaintiff requested review of the ALJ's decision on August 25, 2008. (*Id.* at 17) The Appeals Council denied Plaintiff's request for review on January 11, 2009. (*Id.* at 9-11) Thus, the July 7, 2008 decision of the ALJ became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On July 20, 2010, Plaintiff filed a complaint seeking judicial review of the ALJ's July 7, 2008 decision. (D.I. 2) Subsequently, on July 7, 2011, Plaintiff moved for summary judgment. (D.I. 20) In response, on October 3, 2011, the Commissioner filed a cross-motion for summary judgment. (D.I. 25)

## B. Factual Background

### 1. Plaintiff's Medical History, Treatment, and Condition

Plaintiff was forty-two years old on her alleged disability onset date and was considered a "younger individual" for purpose of DIB. *See* 20 C.F.R. § 404.15639(c); Tr. at 37, 71. She was forty-seven years old when the ALJ rendered a decision in this case. (Tr. at 24, 37) Plaintiff is a high school graduate who previously worked as an assistant restaurant manager and ATM processing teller. (*Id.* at 37)

As a result of a December 31, 2003 work accident, Plaintiff sustained injuries to her neck, back, and left arm. (*Id.* at 24) Plaintiff has been diagnosed with degenerative disc disease of the cervical spine, left cubital tunnel syndrome, left elbow ulnar nerve neurolysis, and lumbar disc disease. (*Id.* at 24, 67) Plaintiff also suffers from depression and anxiety and has been diagnosed with bipolar disorder. (*Id.* at 67) Plaintiff has undergone significant treatment for both her physical and mental health issues, as detailed below.

2

## a. Plaintiff's Physical Impairments

In January 2004, after complaints of numbness in her left hand, Plaintiff underwent an electromyographic nerve conduction study ("EMG"). (*Id.* at 244-45) The EMG showed mild left ulnar entrapment neuropathy at the elbow, but no evidence of carpal tunnel or cervical radiculopathy in the left upper extremity. (*Id.* at 245) In February 2004, Randeep S. Kahlon, M.D., diagnosed left elbow cubital tunnel syndrome and left cervical radiculopathy. (*Id.* at 497) In April 2004, Dr. Kahlon performed a left elbow cubital tunnel release. (*Id.* at 160-61, 488) Although Plaintiff demonstrated normal elbow flexion during a follow-up examination in June 2004, she continued to complain of paresthesia in her fourth and fifth digits. (*Id.* at 487)

A February 2004 MRI of Plaintiff's cervical spine indicated small central disc protrusions from C3 through C7, most prominent at C5-C6. (*Id.* at 286) Consequently, in May 2004, James G. Moran, D.O., performed a left C6 selective nerve root block. (*Id.* at 154)

In August 2004, Bruce E. Katz, M.D., performed an anterior cervical disectomy and fusion at the C5-C6 level. (*Id.* at 155-56) Within a month of the surgery, Plaintiff's incisions were well-healed and she had maximum motor strength in her cervical spine. (*Id.* at 485)

In December 2004, Plaintiff continued to complain of pain down her left arm, mostly involving her small finger. (*Id.* at 483) An EMG showed residual left ulnar neuropathy and left lower cervical dorsal rami irritation. (*Id.* at 166-67; 483) In January 2005, Dr. Katz reported that Plaintiff's neck symptoms were fairly benign. (*Id.* at 478) A February 2005 x-ray of the cervical spine showed good fusion with no gross motion. (*Id.*) A functional capacity evaluation ("FCE") in February 2005 indicated slightly reduced muscle strength in Plaintiff's shoulder and elbow and reduced range of motion in the cervical region. (*Id.* at 618-21)

3

An April 2005 MRI showed a possible slight increase in the size of the central protrusion at C4-C5 and a small left lateral disc herniation in the lumbar area at L3-L4. (*Id.* at 282-84) An EMG taken on April 7, 2005 was abnormal, showing Plaintiff's left ulnar sensory neuropathy was getting worse. (*Id.* at 165)

On June 3, 2005, Plaintiff underwent a left elbow revision of ulnar neurolysis and submuscular transposition with medial flexor tendon lengthening. (*Id.* at 157-61) In June 2005, two weeks after surgery, Dr. Kahlon reported that Plaintiff was "doing very well." (*Id.* at 468) A November 2005 EMG did not show any elbow compression along the ulnar nerve, although Plaintiff continued to experience some pain. (*Id.* at 464)

In May 2006, Dr. Katz performed a C5-C6 posterior cervical fusion. (*Id.* at 241-42, 264-65) A follow-up CT scan in October 2006 showed good bone formation and no instability at the C5-C6 following the surgery. (*Id.* at 279) There was mild disc protrusion on the dural sac at C3-C4. (*Id.*)

In September 2006, Dr. Katz referred Plaintiff to Ann Kim, M.D., for pain management. (*Id.* at 455) Dr. Kim diagnosed Plaintiff with chronic cervical radiculopathy and myofascial pain, prescribed Lyrica and Vicodin, and referred Plaintiff for aquatic physical therapy. (*Id.* at 454)

### b.    Plaintiff's Mental Impairments

In September 2005, Irene Fisher, Psy. D., began treating Plaintiff for psychological symptoms which were secondary to Plaintiff's chronic pain condition. (*Id.* at 162) On September 12, 2005, Dr. Fisher performed a consultative psychological examination of Plaintiff. (*Id.*) Dr. Fisher diagnosed Plaintiff with major depressive disorder with suicidal ideations and referred Plaintiff to the Rockford Center for psychiatric treatment. (*Id.*)

4

Plaintiff underwent treatment at the Rockford Center for a two-week period from

September 14, 2005 through September 27, 2005. (*Id.* at 174-78) Upon admission to the

Rockford Center, Plaintiff presented as severely depressed, with suicidal ideas and constant

worries. (*Id.* at 174-75) After beginning treatment, Plaintiff "started to feel better" and no longer

had suicidal thoughts. (*Id.* at 175-76) At the time of her release, Plaintiff's treatment team felt

that she was stable. (*Id.* at 176)

After discharge from the Rockford Center, Plaintiff received periodic treatment at the

New Castle County Community Mental Health Center from December 2005 through March

2007. (*Id.* at 327-408) A March 30, 2007 psychiatric re-evaluation indicated that Plaintiff

continued to complain of pain, but reported that her depression was under control. (*Id.* at 327)

### c.    Opinions on Plaintiff's Ability to Work

Plaintiff underwent a FCE on September 12, 2006. (*Id.* at 275-78) Dr. Katz interpreted

the FCE as indicating that Plaintiff could not return to her previous job as a processing teller.

(*Id.* at 478) However, the FCE indicated "return to work" as a goal, and Dr. Katz opined that

Plaintiff could return to work "per her FCE restrictions." (*Id.* at 478, 619) The FCE restrictions

included limiting Plaintiff to part-time modified duty, not to exceed four hours to start with, and

increased hours if she was able. (*Id.* at 275)

In October 2006, at the request of the Worker's Compensation Board, Plaintiff saw David

Stephens, M.D. (*Id.* at 670-75) Dr. Stephens opined that Plaintiff "was not capable of sustaining

any type of work." (*Id.*) Dr. Katz reviewed the opinion of Dr. Stephens and determined that

Plaintiff could return to work per the restrictions of the FCE for a trial period only and that it was

certainly possible that Dr. Stephens was correct in that Plaintiff might not be able to return to

5

work at all. (*Id.* at 32-33)

On January 15, 2008, Dr. Kim evaluated Plaintiff's ability to work and completed a Residual Functional Capacity ("RFC") Questionnaire. (*Id.* at 500-505) Dr. Kim stated that Plaintiff would need a job that permitted shifting positions at will from sitting, standing, or walking. (*Id.* at 503)

On February 6, 2008, Plaintiff's therapist, Michelle Sullivan, completed a mental RFC assessment. (*Id.* at 561-66) Ms. Sullivan opined that Plaintiff's mental impairments prevented her from sustaining gainful activity. (*Id.* at 561-66, 668-69)

## 2. The Administrative Hearing

Plaintiff's administrative hearing took place on May 6, 2008. (*Id.* at 22) Plaintiff testified at the hearing and was represented by counsel. (*Id.* at 668-72) A vocational expert also testified. (*Id.* at 715-24)

### a. Plaintiff's Testimony

At the hearing, Plaintiff testified that she has a valid driver's license, but that her driving is limited by her medical conditions and medications. (*Id.* at 693-94, 698) Plaintiff stated that she is a high school graduate. (*Id.* at 694) Regarding employment at the time of the hearing, Plaintiff testified that she was in vocational rehabilitation, but was on hiatus from the vocational rehabilitation until specialized equipment could be obtained. (*Id.* at 694-95) Plaintiff further testified that she had previously worked as an ATM teller and a restaurant manager. (*Id.* at 696-97) She stated that she had to perform "some heavy lifting" in her past employment; specifically, as an ATM teller, Plaintiff often had to lift heavy money tubs. (*Id.*) She testified that she was injured while working as an ATM teller after trying to lift a seventy-five-pound tub. (*Id.* at 698)

6

Plaintiff also testified about the impairments that she feels have prevented her from returning to work and vocational rehabilitation. She described the pain in her neck as "really tight" and "really painful" even after two surgeries. (*Id.*) Plaintiff stated that, without medication, the pain in her left arm and left hand is constant. (*Id.*) She said that she experiences difficulty grasping and moving basic household items. (*Id.* at 700) Plaintiff testified that she experiences pain in her lower back all of the time and described the pain as being "pretty bad" at best and "like a knife" at worst. (*Id.* at 701)

Plaintiff further testified that her bipolar disorder negatively impacts her life because she experiences trouble sleeping, does not like to leave her home, and does not have many friends. (*Id.* at 702) Plaintiff described the limitations resulting from her physical and mental impairments: (1) after approximately thirty minutes, she must sit down and take a break due to ankle swelling; (2) she has trouble remaining on her feet for forty-five minutes; (3) she is unable to sit in the same position for more than an hour without experiencing back pain that is "like a knife;" and (4) she believes her ability to lift any weight with either arm is limited to approximately three pounds. (*Id.* at 704-05) Plaintiff explained that, despite her physical and mental impairments, she is able to do basic chores, such as laundry. (*Id.* at 706)

### b.    Vocational Expert's Testimony

Louis Szollosy, an independent vocational expert, also testified at the hearing. (*Id.* at 715-25) Mr. Szollosy characterized Plaintiff's past work as an ATM teller and as a restaurant manager as skilled, medium work. (*Id.* at 715-16)

The ALJ posed a hypothetical question to Mr. Szollosy, asking if there were any jobs that could be performed by a hypothetical individual aged forty-two on her alleged onset date, who

7

had a high school education and past relevant work experience as indicated by Plaintiff; who was right-handed and suffered from degenerative disc disease of the cervical spine; who had undergone release of her cubital tunnel; who had moderate pain and decreased range of motion in the left upper extremity; who suffered from depression and had occasional mood swings due to bipolar disorder; who was mildly to moderately limited in the ability to perform daily activities, interact socially, and maintain concentration, persistence, and pace; who was limited to lifting twenty pounds occasionally and ten pounds frequently; who could stand for thirty minutes and sit for thirty minutes consistently during an eight-hour day; who had to avoid heights and hazardous machinery; who could do no prolonged climbing, balancing, or stooping; who had to avoid vibrations and temperature and humidity extremes; who had to avoid repetitive neck turning due to her cervical fusions; and who would be mildly limited as to pushing and pulling in the left upper extremity, but would be able to do sedentary work activities. (*Id.* at 716-17, 719) In response, Mr. Szollosy indicated that an individual with those limitations could perform the representative light exertion unskilled jobs of photocopy machine operator and mail sorter as well as the representative sedentary unskilled jobs of document preparer and order clerk. (*Id.* at 717-19)

### 3. The ALJ's Findings

On July 7, 2008, the ALJ issued the following findings:[1]

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

---

[1]The ALJ's factual findings have been extracted from his decision, which interspersed factual findings and commentary. (Tr. at 24-38)

8

2.    The claimant has not engaged in substantial gainful activity since December 31, 2003, the alleged onset date (20 C.F.R. 404.1520(b) and 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease of the cervical and lumbar spine; status post left elbow cubital tunnel release with continued left arm symptoms and bipolar disorder (20 C.F.R. 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 494.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except that she could sit and stand/walk for 30 minutes consistently on an alternating basis for 8 hours a day, 5 days a week; would need to avoid heights and hazardous machinery; would need to avoid prolonged climbing, balancing and stooping, meaning no more than 1-2 times per hour; would need to avoid vibration and temperature and humidity extremes; would need to avoid repetitive neck turning due to her C5-6 fusion; would be mildly limited as to pushing/pulling with the left upper extremity and would be mildly to moderately limited as to her ability to concentrate, persist and perform at a consistent pace.

6.    The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565).

7.    The claimant was born on May 16, 1961 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41, and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1560(c) and 404.1566).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2003 through the date of this decision (20 C.F.R. 404.1520(g)).

(Tr. at 24-38)

## III. LEGAL STANDARDS

### A. Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than

10

simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475

U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005)

(stating party opposing summary judgment "must present more than just bare assertions,

conclusory allegations or suspicions to show the existence of a genuine issue") (internal

quotation marks omitted). However, the "mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242,

247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v.

Catrett*, 411 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a

party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial").

## B.    Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by

"substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Med. Ctr. v. Heckler*, 806

F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the

evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546,

552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does

not mean a large or significant amount of evidence, but rather such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*,

487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that:

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

*Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## IV.  DISCUSSION

### A.  Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of

insurance benefits to persons who have contributed to the program and who suffer from a

physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Title XVI of the

Social Security Act provides for the payment of disability benefits to indigent persons under the

SSI program. 42 U.S.C. § 1382(a). A "disability" is defined for purposes of both DIB and SSI

as the inability to do any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C.

§§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is disabled "only if his physical or mental

impairment or impairments are of such severity that he is not only unable to do his previous work

but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a

five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d

422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point

in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R.

§§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any

substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating

13

finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe), 416.920(a)(4)(ii). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of

14

non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

### B.     Watunya's Arguments on Appeal

Watunya presents three arguments on appeal: (1) the ALJ failed to accord adequate weight to the opinions and assessments of Watunya's treating physicians, Drs. Katz and Kim; (2) the RFC assessment failed to consider the full impact of Watunya's severe left arm impairment on her functional ability; and (3) the Commissioner failed to sustain his burden of establishing that there is other work in the national economy that Watunya can perform.

### 1.     Whether the ALJ failed to accord adequate weight to the opinions and assessments of Watunya's treating physicians

Plaintiff first argues that the ALJ failed to give controlling weight to the opinions of her treating physicians, Drs. Katz and Kim. (D.I. 21 at 15, 17) The Commissioner responds that the ALJ gave appropriate weight to all medical evidence. (D.I. 27 at 19)

A treating physician's opinion is entitled to controlling weight when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with the other substantial evidence of the record. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The

15

ALJ must consider, discuss, and weigh all relevant medical evidence and explain his reasoning

for giving some opinions more weight or rejecting them. *See Plummer*, 186 F.3d at 429.

The ALJ gave controlling weight to Dr. Katz's November 2006 opinion that Plaintiff

could work per the FCE restrictions. (Tr. at 33) The ALJ explicitly noted that Dr. Katz's

opinion was entitled to deference because Dr. Katz was "clearly in the best position to determine

[ Plaintiff's] capabilities." (*Id.*) Later, Dr. Katz noted that Dr. Stephens, a physician who

performed an independent medical exam at the request of the worker's compensation board,

opined that Plaintiff was unable to return to work. (*Id.* at 32) After reviewing the opinion of Dr.

Stephens, Dr. Katz stated that it was certainly possible that Plaintiff may be unable to return to

work at all. (*Id.* at 33) The ALJ explicitly noted the inconsistencies in Dr. Katz's later opinion

as compared to Dr. Katz's own observations of Plaintiff and earlier opinion that Plaintiff could

return to work. (*Id.*) In rejecting Dr. Katz's later acceptance of Dr. Stephens's opinion, the ALJ

noted that Dr. Katz failed to provide any reason for accepting the opinion of a physician who had

only seen Plaintiff once. (*Id.*) The ALJ adequately explained his decision to reject Dr. Katz's

later inconsistent opinion.

The ALJ also considered the opinion of Dr. Kim, another of Plaintiff's treating

physicians, who completed a RFC on January 15, 2008. (*Id.* at 500-05) The ALJ determined

that Dr. Kim's RFC assessment was not entitled to significant weight because it was inconsistent

with Dr. Kim's earlier recommendation that Plaintiff return to work with restrictions per the

FCE, not supported by the record as a whole, and inconsistent with Dr. Kim's own treatment

notes. (*Id.* at 33-34) The ALJ observed that Dr. Kim had recommended "work restrictions per

[the] FCE" in her treatment notes (*id.* at 583), which was inconsistent with Dr. Kim's findings in

16

the RFC. Further, the ALJ noted that Dr. Kim's subsequent RFC assessment was inconsistent with the FCE in several key respects: (1) the FCE allowed for greater lifting ability than Dr. Kim's RFC assessment (*id.* at 34, 276, 504); and (2) the FCE did not indicate that Plaintiff would have pain constantly interfering with her attention, as Dr. Kim had opined (*id.* at 34, 276, 500, 502-04). The ALJ further noted that, despite Dr. Kim's suggestion that Plaintiff begin by working only four hours per day, there was no indication that Dr. Kim intended permanently to limit Plaintiff to part-time work. (*Id.* at 33) The Court concludes that the ALJ adequately explained his rationale for giving little weight to the opinion of Dr. Kim.

The ALJ was entitled to weigh the various medical opinions and come to his own reasoned conclusion. *See Brown v. Astrue,* 649 F.3d 193, 196 (3d Cir. 2011) ("[The] ALJ is not bound to accept the opinion or theory of any medical expert, but may weigh the medical evidence and draw its own inferences."). Based on the ALJ's detailed assessment of all relevant medical evidence, the Court concludes that there is substantial evidence to support the ALJ's determinations as to the weight to accord the opinions of Plaintiff's treating physicians. The ALJ adequately explained the amount of weight he gave to these opinions and his basis for doing so.

## 2. Whether the RFC assessment failed to consider the full impact of Watunya's severe left arm impairment on her functional ability

Next, Plaintiff contends that in the RFC assessment the ALJ failed to include "almost all of the symptoms and restrictions stemming from" her left arm impairment. (D.I. 21 at 19) In response, Defendant argues that the ALJ properly accounted for all limitations resulting from Plaintiff's left arm impairment. (D.I. 27 at 20)

The ALJ recognized that Plaintiff's left arm injury status after her left elbow cubital

17

release was a severe impairment. (Tr. at 24) The ALJ accounted for any limitations Plaintiff may have had by acknowledging her moderate pain and decreased range of motion in the left upper extremity, her limitations on pushing and pulling in the left upper extremity, and her need to avoid heights and repetitive neck turning. (*Id.* at 716-17)

The ALJ's conclusion regarding the impact of Plaintiff's left arm impairment is supported by substantial evidence. Plaintiff indicated that the she was able to perform various household chores, such as light laundry, dusting furniture, running the vacuum, and washing the dishes. (*Id.* at 126) The medical records indicate that Plaintiff did very well within two weeks after her left elbow cubital tunnel release. (*Id.* at 160-61, 488) Plaintiff recovered normal elbow flexion, and there was no disc herniation, cord compression, or spinal stenosis in her cervical spine. (*Id.* at 286, 487) She demonstrated maximum motor strength shortly after her cervical disectomy and fusion, and there was no evidence of entrapment neuropathy, polyneuropathy, or myopathy in her left upper extremity. (*Id.* at 155-56, 485, 580) Additionally, Plaintiff reported that her pain level was at a "3" on a 10-point scale. (*Id.* at 450)

Thus, the Court concludes that the ALJ's RFC assessment adequately accounted for the full impact of Watunya's severe left arm impairment on her functional ability.

### 3. Whether the Commissioner failed to sustain his burden of establishing that there is other work in the national economy that Watunya can perform

Finally, Plaintiff argues that the ALJ's reliance on the vocational expert's testimony was misplaced because the hypothetical question was deficient as it did not accurately convey all of her impairments and the limitations they cause. (D.I. 21 at 22) Defendant responds that the ALJ's hypothetical question properly conveyed all of Plaintiff's limitations, including her upper

extremity restrictions. (D.I. 27 at 22) Therefore, Defendant asserts that the ALJ properly relied on the vocational expert's determination that there were various jobs in the national economy that Plaintiff was capable of performing. (*Id.*)

Because Plaintiff established that she is unable to return to her past employment, the burden shifted to the Commissioner to "demonstrate that the claimant is capable of performing other available work in order to deny a claim of disability." *Plummer*, 186 F.3d at 428; *see also* 20 C.F.R. § 404.1520(f). The Commissioner needs to identify at least one occupation that exists in significant numbers in the national economy that Plaintiff can perform. *See Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987). A vocational expert's answer to a hypothetical question can be considered substantial evidence only when the question reflects all of the claimant's impairments that are supported by the record. *See Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). However, the ALJ need not include any impairments and limitations that are not "medically established" by the record. *See Rutherford*, 399 F.3d at 554.

In Plaintiff's case, the ALJ limited the hypothetical claimant to performing light and sedentary tasks, noted that the hypothetical claimant had moderate pain and decreased range of motion in the left upper extremity, was mildly limited as to pushing and pulling in the left upper extremity, and needed to avoid heights and repetitive neck turning. (Tr. at 716-19) Based on these limitations, the vocational expert opined that there were at least four occupations that such a hypothetical claimant could perform: a photocopy machine operator, mail sorter, document preparer, and order clerk. (*Id.* at 717-19)

The limitations in the hypothetical are consistent with the September 2006 FCE and medical interpretations of that FCE, as reflected in Dr. Kim's treatment notes and Dr. Stephens's

19

initial opinion of Plaintiff. (*Id.* at 275-78) As the Court explained above, the limitations that the ALJ included in his assessment of the RFC and in the hypothetical question are supported by substantial evidence in the record. The ALJ did not err in adopting the initial opinion of Plaintiff's treating physician, Dr. Katz, giving little weight to the opinion of Dr. Kim, and rejecting the opinion of Plaintiff's non-treating physician, Dr. Stephens. Therefore, the ALJ was not required to include any additional limitations in the hypothetical question.

Accordingly, the Court finds that the hypothetical question was properly formulated. As such, it can be relied upon as substantial evidence supporting the ALJ's conclusion that Plaintiff is not totally disabled. *See Chrupcala*, 829 F.2d at 1276. The vocational expert's testimony that Plaintiff was capable of performing two light and sedentary jobs, which exist in significant numbers in both the local and national economy, satisfies the Commissioner's burden of establishing that there are jobs available which Plaintiff can perform given her impairments.

## IV. CONCLUSION

For the foregoing reasons, the ALJ's decision is supported by substantial evidence. Thus, the Court will deny Plaintiff's motion for summary judgment and grant Defendant's motion for summary judgment. An appropriate Order follows.